CHARLES F. ST. JOHN V. CLEVELAND COLLATERAL LOAN CO.

**Salacious Conversations by Manager of Collateral Loan Company with Women of Easy Virtue not Misconduct nor Injury to Business.**

It is error to instruct a jury that salacious conversation on the part of the manager of a collateral loan company with certain female patrons would tend, as a matter of law, to injure the business of the company and afford ground for terminating the contract of employment, when the testimony tended to show that the conversations complained of were with women of easy virtue and the business of the company was in no wise injuriously affected thereby.

*J. A. Fogle,* for plaintiff in error.
*Ammerman & Thompson,* for defendant in error.

**GRANT, J.**

This petition in error asks the reversal of the judgment of the court of common pleas. The parties are as they were below.

The facts as stated in the plaintiff's brief and its statement of his claim of error may be treated here as sufficiently accurate for the purposes of this opinion; they are as follows:

"On October 8, 1909, defendant by written contract, employed plaintiff as its general manager for the term of three years, at a salary of $3,000 per year. The written contract was silent as to when the term began, but by the assent of both parties, plaintiff entered upon his duties under said contract on November 20, 1909, and continued to perform the same until July 12, 1911, receiving his salary up to the last named date at the rate of $3,000 per annum according to the terms of the contract. On the last named date he was summarily discharged by the defendant, and in due course he brought this action to recover damages for alleged breach of the contract in discharging him without cause. The defense set up in the answer, after admitting

the contract of employment, of service thereunder and the payment of wages during the period of actual service, as alleged in the petition, proceeds as follows:

''For further answer defendant says that on July 12, 1911, plaintiff was discharged from the further service of the defendant company for cause in this, to-wit:

''First, because he failed, neglected and refused to devote all of his time, ability, energy, and attention to the business of the defendant company; second, because he failed, neglected and refused to obey and execute orders given by defendant company; third, because while in the employment and acting as general manager of the defendant company, he mistreated, misused and insulted numerous lady patrons by improper and indecent proposals and conduct toward them, to the great and irreparable injury of the business, good name, and reputation of the defendant company.''

Plaintiff, by reply, denied the foregoing allegations of the answer.

Issue being thus joined, a trial was had resulting in a verdict for plaintiff, which was set aside by the court for errors of law, and upon a retrial a verdict was returned for the defendant, and judgment rendered thereon, and this proceeding is prosecuted to reverse that judgment.

Plaintiff claims that there was manifest error on the part of the court in its charge to the jury, which error was material and substantial and prejudicial to plaintiff's rights, and in addition to that plaintiff contends that the verdict and judgment is against the manifest weight of the evidence and is contrary to law.

Taking these assignments of error in the order of statement and the first is concerned with the charge of the trial court given to the jury in writing before argument, at the request of the defendant. It is as follows:

''The court: The defendants have requested the court to charge the jury before argument, which request the court grants. The statute permits either party to give certain charges in writing. Of course, the court will charge you generally after the argument is over, but I give this special charge to you now: 'If you find from a preponderance of the evidence that the plaintiff, Charles F. St. John, while acting as manager for the defendant company, did have any conversation with Mrs. Eliza-

beth Sexton, Mae Miller and Anna Lucas Jackson, or either of them, while such persons or either of them were patrons or borrowers of the defendant company, wherein it was proposed or suggested by him that they consent to improper relations with him, or if you find that he made or approved one or more loans from the defendant company to Margaret Smith, with the understanding or agreement that said loan was to be paid, in whole or in part, by her submitting to improper relations with him, then I instruct you, as a matter of law, that such conversation or conduct on his part would tend to injure the business of the defendant company, and would be sufficient cause for his discharge.' ''

Instructions given in writing before argument are thought to be, and undoubtedly are, in some respects at least, of a more weighty and imposing character than the general and ordinary charge. They are to be with the jury in their retirement. They may not be enlarged or contradicted by any subsequent instruction, and to satisfy the requirements of the statute allowing them they must in all their parts state the law—no more and no less.

In this view of the matter, we think the charge complained of puts the case against the defendant much too strong, if it is to be measured by the real significance of the facts to which it purported to be applied. It said, roundly and as inerrant matter of law, that the tendency of the alleged talks, if they were proved, of the plaintiff with three named women, or with either one of them, was ''to injure the business of the defendant company.'' The defendant company was not running a Sunday school, nor was it a society for the promotion of social purity in Cleveland. It's business was something quite different; it was that of loaning money and, as a part of its name implies, traps and calamities—alias the furniture of the dissolute as well as of the virtuous—were the securities with which it had to do. Its patrons must have included all sorts, and presumably among them the kind of people upon whom the alleged Lotharian proclivities of Mr. Saint John would not only produce no adverse impression, but on the other hand would be a positive allurement and incentive to do business of the kind pursued by the Cleveland Collateral Loan Co. The company was ''out for the stuff.'' All was grist that came to its mill. Common experience, or at least common sense, teaches that it trafficked in the

necessities of the unfortunate, and the unfortunate, as is well known, include the morally loose and disreputable, who figure extensively in the kind of trade driven by the denizens of the underworld as well as the defendant company and its kind, much to the profit of the latter. The word "Saint," crystallized in the plaintiff's name, would not probably drive one of these people from the friendly doors of the defendant, while to the holy it might be a recommendation and an advertisement. The word is a part of his name and does not signify, necessarily, his habits or proclaim his business as being saintlike. His namesake of old was so merciful that he said: "He that hath two coats, let him impart to him that hath none; and he that hath meat, let him do likewise." A manager of a collateral loan company known as having such a name, might well be an attraction to both sorts.

Putting the worst construction upon what Mr. St. John is charged with having said to any of these women, and it is not easy to find in it the tendency which the court charged as matter of law was in it, beyond explanation or construction more charitable than the evil intent which the court imputed to it. And this is said bearing in mind that the injury which the company says it suffered because of St. John's unsaintly talk was a business injury and not an injury to that which a corporation, and much less a collateral loan company in a large city, cannot have —morals. Of course the exuberant talk of Mr. St. John cannot have affected the business of the defendant injuriously—and an injury to it in a business point of view would alone justify his discharge—unless actual or intending customers were driven away by it. And to have been so driven away, disgusted or virtuous patrons must have known of it. There is no evidence in the record to show that they did, except in the cases of the women named—and of these presently. That the women told anyone of it does not appear. That St. John's alleged salacious conversations did not drive the women themselves from the defendant company, is clear. Mrs. Sexton, while intimating that she did not like that kind of talk and that she made up her mind to be quit of the concern as soon as she could, on that account, seems to have thought better of it later. She says she called St. John personally by telephone three, or perhaps four times, asking for more time on her loan. This was not the conduct of a

St. John v. Cleveland Col. Loan Co.

badly insulted woman, nor did it deprive, or tend to deprive, the loan company of a single intending patron, or drive off one already there.

To the same purport and of like undamaging effect, and, as we think, tendency, is what is said to have passed between St. John and Mrs. Miller. Mrs. Miller says she did not think his talk was "very nice"; but it does not appear to have acted as a deterrent to her dealing with the company. She went on negotiating for a loon, which she finally declined to take, not because St. John's talk was "not very nice," but because she thought that the $10 which this corporation of outraged moral sensibilities charged for the use of $60 was more than she ought to pay. The company's virtue did not suffer by the occurrence, but remained inviolate for all that St. John did towards ruining it by his barren advances to Mrs. Miller.

Dickens makes ·Wackford Squeers, the Yorkshire schoolmaster, assure Mr. Snawley that he had "come to the right shop for morals," and such seems to have been the thought of Mrs. Jackson in the present case. She says that she simply paid no attention to what St. John said to her, but passed it off as perhaps a piece of rather awkward, or unhappily worded pleasantry—a construction which may be put upon it by a charitably minded person, doubtfully including a collateral loan company. At page 122 of the record Mrs. Jackson says:

"Q. If Mr. St. John made any suggestions to you or advances to you, Mrs. Jackson, I wish you would state what they were?

"A. He just naturally made a slight remark about making a little engagement, but I didn't pay any attention to it."

And on page 124:

"A. I didn't pay any attention to it."

So Mrs. Jackson was not disgustedly driven away from trafficking with the company by any supposed lapse from virtue of Mr. St. John.

The case of Mrs. Smith alone remains. Her name is not so uncommon that the attention of intending dealers with the company would be likely to be attracted to it adversely to the latter if her alleged illicit commerce with Mr. St. John were known.

But the transactions imputed to the two were of all things the least likely to become known. People who go about to do what they are charged with doing do not publish the fact in the newspapers or station a brass band in front of the house to proclaim what is going on within. Granting that Mrs. Smith was an underworldling, as is claimed, plying her avocation in Cleveland, and still the fact does not necessarily and as matter of law evidence the tendency postulated in the charge complained of, assuming also that she and St. John were guilty of improprieties as charged and that the fact was known in the circles in which Mrs. Smith moved. Indeed we think the tendency might be quite the other way and quite to the advantage of the loan company. For, assuming—as experience allows—that the patrons of loan companies are largely recruited from the purlieus of such places as Mrs. Smith is said to have kept, and it would be likely to follow that in those parts St. John might be accounted a pretty popular fellow, and one calculated, for his company, to do a stiff business. The charge against him in this case is not that Mrs. Smith's money would have been tainted money, if the company had got it, but that the company did not get it. If the complaint was that St. John instead of the company reaped the usufruct of the Mrs. Smith loan, that would be one thing; it might amount to an embezzlement of assets. But what is complained of is not an act but a tendency necessarily engendered by the act. We do not think that such tendency necessarily, or even probably, arose from what St. John is charged with having done—if he did it.

And St. John denies, point blank, all the delinquencies imputed to him. As to a good deal of it, after all, an innocent as well as evil construction may be put upon it. That is, the comparatively innocent construction that the talk was the inconsiderate outcrop of a badly regulated habit of thinking, sometimes observable in men after they have arrived at an age when such expectorations of speech canot mean much more than talk, and which at worst are put forward tentatively rather than with danger of harmful action.

Upon all these considerations, it seems that the question of the tendency of St. John's alleged remarks and acts to injure the business and not the morals of the loan company, was one of fact

St. John v. Cleveland Col. Loan Co.

to be resolved by the jury, under proper instructions, and not by the court, dogmatically and as matter of law.

That it was not left to the jury was error, to the clear prejudice of the party entitled to have it so left.

Error is also alleged as to the general charge. That charge in the respect complained of was in the following language:

"If you, therefore, find by a preponderance of the evidence in this case, and I have defined that to you, that the defendant on July 12, 1911, discharged the plaintiff for any one or all of the causes set out in its answer, or for any other just and reasonable cause, then I say to you that the plaintiff cannot recover in this action, and that your verdict should be for the defendant. If, however, from all the evidence in the case, you find that the defendant did not discharge the plaintiff from its employment for the reasons claimed by it and set up in its defense, in its answer, or for any other just and reasonable cause, then the discharge of the defendant would be a wrongful discharge, and without just cause, and your verdict should be for the plaintiff."

Twice here the jury is allowed to defeat the plaintiff's claim "for any other just and reasonable cause," meaning thereby for a cause other than any alleged in the answer as a defense, and other than any to which the proof in the case was alone addressed. This is doing better by a litigant than he has seen fit to do for himself. "Ask, and ye shall receive," says the Scripture. Here the court says one may receive without asking.

Elsewhere in the charge the same thing is negatively stated thus: "And I say, as I have already said before, that if you find from all the evidence in the case that the reasons set up in defendant's answer were not the reasons why it discharged the plaintiff, and that those reasons did not exist in fact, and that it discharged the plaintiff without any good and sufficient cause, then the plaintiff would be entitled to recover in this action." And in still another place this negative statement is made. To give this in charge to the jury and not to cure it by anything to be found elsewhere in the instructions given, is absolutely error, prejudicial to the plaintiff.

Complaint is made as to the sufficiency of the charge as given in respect of the alleged defense that the plaintiff was inattentive to the business of his employer; it may be enough to say that no request was made to make the charge more sufficient.

The charge covered the point—rather meagerly, it is true—but in the absence of a request to say more, it was enough.

We decline to disturb the judgment on the weight of the evidence. There was evidence fit to go to the jury which should have brought a right verdict if the instructions had been proper.

For the errors found the judgment complained of is reversed and the cause remanded for further proceedings according to law.

WINCH and MEALS, JJ., concur.